**SO ORDERED.**

**SIGNED this 29 day of October, 2007.**



*Dale L. Somers*
Dale L. Somers
**UNITED STATES BANKRUPTCY JUDGE**

_____

Opinion Designated for Electronic Use, But Not for Print Publication
IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| In Re: | |
| CHRISTOPHER CHARLES NORRIS, MARY BETH NORRIS, | CASE NO. 05-43551-7 CHAPTER 7 |
| DEBTORS. | |
| FRONTIER FARM CREDIT, PCA, | |
| PLAINTIFF, | |
| v. | ADV. NO. 06-7005 |
| CHRISTOPHER CHARLES NORRIS, MARY BETH NORRIS, CRAIG C. NORRIS, FIRST NATIONAL BANK OF GIRARD, FORD MOTOR CREDIT COMPANY, | |
| DEFENDANTS. | |

**OPINION GRANTING DEFENDANT FIRST NATIONAL BANK OF GIRARD'S MOTION TO DISMISS**

This proceeding is before the Court on Defendant First National Bank of Girard's motion to dismiss the plaintiff's claim against it. First National appears by counsel Bruce J. Clark and Kana R. Lydick of Henson, Clark, Hutton, Mudrick & Gragson, LLP, of Topeka, Kansas. Plaintiff Frontier Farm Credit, PCA, appears by counsel Richard Petersen-Klein of Fisher, Patterson, Sayler & Smith, L.L.P., of Topeka, Kansas. The Court has reviewed the relevant materials and is now ready to rule.

**FACTS**

This proceeding began as Frontier's dischargeability complaint against the Debtors. Frontier later obtained permission to amend its complaint to seek additional relief. Among other things, Frontier asserted a claim against First National based on the following allegations.

In 2003, the Debtors pledged all their presently-owned and after-acquired cattle to Frontier as security for a $150,000 revolving line of credit. In March 2004, Debtor Chris Norris ("father") sold 198 head of cattle through a livestock market. From the proceeds, he had the livestock market issue a $25,000 check to his son, Craig Norris ("son"). Later, he paid his son another $5,600 from the proceeds of that sale by a check drawn on the bank account of an entity the Debtors owned. In August 2004, the father sold another 25 head of cattle through the livestock market, and had the market issue a $15,187.54 check to his son from the proceeds of that sale. Frontier alleges the Debtors defrauded it through these transactions by diverting proceeds of its collateral to their son.

According to the amended complaint, the son deposited the $25,000 and $5,600

2

Case 06-07005    Doc# 136    Filed 10/29/07    Page 2 of 7

checks in his account at First National, and then wrote a $30,547.36 check to First National, which the bank applied to two loans he had with it.  He deposited the $15,187.54 check in his account at First National, and the bank applied $14,500.01 of the deposit on one of his loans.  Based on the Debtors' alleged fraud and these allegations, Frontier asks the Court to impose a constructive trust on the $45,047.37 that the son transferred to First National.

After the Court dismissed a somewhat similar claim Frontier had asserted against Ford Motor Credit Company, First National filed a motion to dismiss Frontier's claim against it.  In its response to that motion, Frontier has asserted the following additional facts.

Frontier alleges the son told First National that he and his father had an arrangement to buy and sell cattle together.  The First National account into which the son deposited the money that Frontier claims was proceeds of its collateral was one for which both the son and the father had signing authority, and the account was also identified by the name "Norris Cattle."  The names on this account, Frontier contends, gave First National knowledge "sufficient to warrant" searching the father's name in the Secretary of State's UCC filing records "to determine if the commingling of loan and collateral proceeds posed a threat to First National's loan to [the son]."  If First National had done such a search, Frontier continues, the bank would have learned that Frontier had a lien "against [the father] related to the purchase and sale of cattle."  Frontier suggests First National should then have investigated the arrangement the son had told it he had with his

3

father. By failing to perform such an investigation diligently, Frontier claims First National became a party to the fraud the Debtors perpetrated against Frontier, even though the bank itself might not have engaged in a fraudulent act.

**DISCUSSION**

In this proceeding, the Court recently dismissed Frontier's claim seeking to impose a constructive trust on a payment the Debtors made to Ford Motor Credit Company, and also denied Frontier's motion to reconsider that decision.[1] In those opinions, the Court tried to make clear its view that under Kansas law, a plaintiff cannot assert a valid claim to recover from a third party simply by claiming someone defrauded the plaintiff and paid the proceeds of the fraud to the third party. Instead, as indicated in *Sprague v. Farm Credit Services,*[2] the plaintiff must also allege the third party recipient acted in bad faith, had notice of the plaintiff's trust interest in the original property involved, or did not give consideration for the payment. Applying this rule not only to the facts Frontier alleged in its amended complaint, but also to the additional facts asserted in its response to First National's motion, the Court concludes Frontier has not pled a valid claim to recover the money the son transferred to First National.

Frontier contends it can trace the money the son transferred to First National back to the proceeds of sales of Frontier's collateral, the father's cattle. Frontier's only effort

---

[1] *See* Opinion Granting Defendant Ford Motor Credit Company's Renewed Motion to Dismiss, Docket No. 123 (issued Sept. 10, 2007), & Opinion Denying Plaintiff Frontier Farm Credit's Motion to Reconsider, Docket No. 132 (issued Oct. 23, 2007).

[2] 28 Kan. App. 2d 872 (2001).

to satisfy *Sprague*'s insistence that something more is required to state a claim for relief is to argue First National could have discovered Frontier's security interest in the father's cattle. The Court sees nothing in Frontier's allegations suggesting that anything might have alerted First National that the checks the son deposited at the bank were proceeds from the sale of his father's cattle. In any event, the Court does not believe even that knowledge would have been enough to enable Frontier to recover the money from First National. Instead, First National would have had to have notice that the father's transfer of the proceeds of the cattle to anyone other than Frontier was fraudulent. Of course, a secured creditor can prohibit its debtor from using collateral proceeds for any purpose other than paying that creditor, but a secured creditor can also, as happens routinely, authorize its debtor to sell collateral and use some of the proceeds for other purposes. The Court is convinced that notice of the security interest without notice of the restriction on the use of collateral proceeds is not sufficient to support imposing a constructive trust on the recipient of the proceeds.

Frontier suggests that unless it has stated a valid claim to recover the money the son paid First National, a fraudulent debtor like the father may successfully benefit from wrongful conduct by transferring ill-gotten funds to pay his debts, cutting off a constructive trust, and merely running the risk he will have to repay the defrauded party later. Such a rule, Frontier adds, "encourages creditors to blindly accept payments on

5

pre-existing debt under irregular circumstances free of any obligation to observe."[3]  But the *Sprague* court quoted an opinion explaining that is exactly what the rule is supposed to do:

> It is said that the case is to be governed by the doctrine established in this state that an antecedent debt is not such a consideration as will cut off the equities of third parties in respect of negotiable securities obtained by fraud.  But no case has been referred to where this doctrine has been applied to money received in good faith in payment of a debt.  It is absolutely necessary for practical business transactions that the payee of money in due course of business shall not be put upon inquiry at his peril as to the title of the payor.  Money has no earmark.  The purchaser of a chattel or a chose in action may, by inquiry, in most cases, ascertain the right of the person from whom he takes title.  But it is generally impracticable to trace the source from which the possessor of money has derived it.  It would introduce great confusion into commercial dealings if the creditor who receives money in payment of a debt is subject to the risk of accounting therefor to a third person who may be able to show that the debtor obtained it from him by felony or fraud.  The law wisely, from considerations of public policy and convenience, and to give security and certainty to business transactions, adjudges that the possession of money vests the title in the holder as to third persons dealing with him and receiving it in due course of business and in good faith upon a valid consideration.  If the consideration is good between the parties, it is good as to all the world.[4]

The courts have simply been unwilling to allow the victim of fraud to trace money proceeds of the fraud into the hands of the fraudulent party's transferee unless the victim can show the transferee acted in bad faith or with notice of the fraud, or the transferee gave nothing in return for the proceeds.  Frontier has not alleged facts that could support a conclusion that First National falls into this limited group of transferees from whom

---

[3]Frontier's "Response to First National Bank of Girard's Motion to Dismiss," Docket No. 131 at 2 (filed Oct. 11, 2007).

[4]28 Kan. App. 2d at 876 (quoting *Kimmel v. Bean*, 68 Kan. 598, 605-06 (1904) (in turn quoting *Stephens v. Board of Educ.*, 79 N.Y. 183, 186-87 (1879))).

Frontier could recover.

**CONCLUSION**

For these reasons, the Court concludes First National's motion to dismiss Frontier's claim against it should be and it is hereby granted.

# # #