**SO ORDERED.**

**SIGNED this 05 day of October, 2009.**



_____
**Dale L. Somers**
**UNITED STATES BANKRUPTCY JUDGE**

_____

Opinion Designated for Electronic Use, But Not for Print Publication
**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

In Re:

**CHRISTOPHER CHARLES NORRIS**
**and MARY BETH NORRIS,**

    **DEBTORS.**

**FRONTIER FARM CREDIT, PCA,**

    **PLAINTIFF,**

**v.**

**CHRISTOPHER CHARLES NORRIS,**
**MARY BETH NORRIS, and**
**CRAIG NORRIS,**

    **DEFENDANTS.**

**CASE NO. 05-43551-7**
**CHAPTER 7**

**ADV. NO. 06-7005**

**MEMORANDUM OPINION AND ORDER DENYING COMPLAINT**
**OBJECTING TO DISCHARGE OF CHRISTOPHER NORRIS AND**
**REJECTING REQUEST FOR CONSTRUCTIVE TRUST**

This proceeding was before the Court on January 24 and 25, 2008, for trial on the Plaintiff's claims against Defendant-Debtors Christopher Charles Norris and Mary Beth Norris.[1]  Plaintiff Frontier Farm Credit, PCA ("Frontier"), appeared by counsel Richard Petersen-Klein of Fisher, Patterson, Sayler & Smith, L.L.P., of Topeka, Kansas.  The Defendant-Debtors appeared by counsel Frederick R. Smith of Pittsburg, Kansas.  At the close of the evidence, the Court announced its decision that Frontier had failed to meet its burden to prove that Defendant-Debtor Mary Beth Norris's ("hereafter Debtor Spouse") personal liability on its claim against her should be excepted from her bankruptcy discharge under either §§ 523(a)(2)(A), (a)(2)(B), or (a)(6) of the Bankruptcy Code, and later entered a final judgment on that claim.  The Court is now ready to rule on Frontier's remaining claims against the Defendant-Debtors.

Frontier's claims arise from a secured line of credit it extended to the Debtors for use in their farming operation.  At the close of evidence, the Court ruled that Frontier failed to show that Debtor Spouse committed any fraud in connection with the line of credit.  This written opinion therefore focuses on the allegations against Debtor Christopher Norris (hereafter "Debtor").

Frontier alleges Debtor should be denied discharge on its claim because he made misrepresentations when he applied for the line of credit, and then used at least some of the line for purposes other than the ones stated in the loan application.  Frontier also seeks

---

[1] The Plaintiff's claims against Defendant Craig Norris have been severed for trial at a later time.

to have constructive trusts imposed on some of the Debtors' exempt assets and a few assets they transferred because of their allegedly improper actions. As explained below, the Court concludes Frontier has failed to prove that the Debtor made any misrepresentations, that Debtor submitted a false financial statement to Frontier with intent to deceive Frontier, or that the Debtor intended to harm Frontier or its security interests by any of his actions. Because Frontier has not established that the Debtors committed any fraud against it or had any confidential relationship with it, Frontier is not entitled to any constructive trust remedy.

**FINDINGS OF FACT.**

*1. Frontier's claim.*

Frontier filed a proof of secured claim in this case for $40,934.02, plus interest and attorney fees. It identifies its collateral as livestock, farm equipment, accounts receivable, inventory and proceeds, but states that the value of the collateral is uncertain due to fraud. The claim is the amount of a prepetition default judgment entered against the Debtors for payment of a the balance on a $150,000 line of credit granted to Debtors by Note-and-Loan Agreement dated November 18, 2003.

*2. Events before the Debtors applied for the line of credit with Frontier.*

Before 2003, the Debtors earned income from a variety of sources. Most of the Debtor's earned income came from owning and operating a company called Cash Grain of Weir, Inc., that sold seed, fertilizer, chemicals, and probably other farm supplies. Most of Debtor Spouse's income came from a job as an x-ray technician. The Debtor also

engaged in farming under the name JM Ranch, raising both cattle and crops.

For about four or five years before 2003, the Debtor and his son Craig ran a commingled cattle operation. The Debtor explained this was an arrangement between a father and son that they did not document in writing. The Debtor testified the arrangement was to commingle cattle they each owned on pasture-land, and to share the expenses of fattening them and the proceeds of selling them, roughly 80% for the Debtor and 20% for his son.[2] They did not formally organize this arrangement, and did not report it as a partnership or other separate entity on tax returns or other documents. For the most part, the Debtor and Craig had a man named Ronald "Ronnie" Davied buy young cattle for them that they fattened and sold, usually within a year. At times, they kept some cows that they bred, raising and selling the resulting calves. The cattle were kept on the Debtor's land.

Debtor had a cordial relationship with Bruce Thornton, the Frontier's loan officer who took the application for and approved the line of credit. To conduct business, Mr. Thornton visited Debtor at the Cash Grain office. These meetings occurred every two or

---

[2] Frontier contended that there was no partnership between Debtor and Craig for the cattle operation, and the presence of a commingled cattle operation was a fiction used by Debtor to justify payment to Craig for cattle sold on March 31, 2004. The evidence to support this contention was the inclusion of the value of 266 head in the Debtors' balance sheet, prepared by Frontier, and tax returns of Debtors and Craig. On the Debtors' 2004 tax return, they reported a sale on August 18 of 22 cow-calf pairs, a total of 44 animals, for $15,639. These are the details of a sale by Craig on the same date. The Debtor said the report of the sale on his and Debtor Spouse's return was a "tax return error" caused by his mistaken report of the sale to an accountant at a time when he was under a lot of stress. Frontier's attorney also challenged the Debtor to find the August 18, 2004, sale of cattle reported on Craig's 2004 tax return, but he could not. The Court finds this evidence insufficient to disprove the existence of a commingled cattle operation, as testified by Debtor.

4

three months, or as often as once a month, depending on the season of the year. Debtors had six prior loans with Frontier before applying for the line of credit at issue in this case. Three of those loans were made in 1996, two in 1998, and one in 2000. One of these loans was a line of credit which was open for four years. A bank document in the bank file states, "Borrower is very good to work with and has always handle [sic] his account as agreed." Debtor referred some Cash Grain customers to Frontier. Debtor testified that because of his prior relationship with Frontier, he thought the lender knew about his commingled cattle arrangement with Craig.

Ronnie Davied bought 259 head of cattle for the Debtor in September and October of 2003. The Debtor paid for them using money drawn on a line of credit he had with Exchange State Bank and about $49,000 that Craig borrowed from another lender and gave to his father for purchases. The new cattle all weighed between 400 and 500 pounds.

### 3. The line of credit application and other documentation.

In mid-fall 2003, during a meeting at Cash Grain, Debtor and Thornton discussed refinancing of Debtor's cattle loan in the approximate amount of $100,000 then held by Exchange State Bank. The discussions were for a loan of $150,000 to $200,000 to both pay off the existing loan and provide funds for additional purchases of cattle. Thornton obtained information from the Debtor about the Debtors and their assets. That information included a balance sheet dated July 29, 2003, that someone other than Debtor had compiled. Thornton made a note on the July balance sheet showing the number of

5

calves the Debtor told him he had, 235. There is a second note reading "$150,000 - 200,000," with the first dollar amount circled. Thornton said the second note indicated he and the Debtor had talked about a loan in that dollar range, with the circle indicating the amount they settled on.

Thornton completed a Commercial Loan Application for Debtors to borrow $150,000. The stated purposes were $100,00 to refinance cattle loan, $1,000 for PCA stock, and $49,000 for cattle purchases. The application was signed by both Debtors.

Thornton prepared a Net Realizable Value Worksheet and a Personal Property Valuation Report, both dated October 30, 2003, in connection with the Debtors' loan. He showed they had 266 head of cattle with a market value of $135,017, and a net realizable value of $128,266 (95% of the market value number). Thornton also showed Frontier would be taking equipment as additional collateral, listing five items with a total market value of $13,200, and a net realizable value of $11,880 (90% of the market value number). The NRV Worksheet reported the net realizable value of the assets securing Frontier's loan to the Debtors would be $141,146 while Frontier's "investment" would be $101,000, giving Frontier a net realizable value equity position of $40,146. Thornton said Frontier took the equipment as additional collateral because the cattle did not provide sufficient value for the line of credit.

Using the information supplied by Debtor, Frontier prepared a four page "Balance Sheet-Member & Detail," which was not signed by Debtors. This worksheet provides detail concerning the numbers reported on the actual balance sheet. The third page

6

reported Debtors owned one bull, 15 beef cows, 15 beef calves, 52 beef stocker heifers, and another 183 beef stocker heifers,[3] having a total value of value of $135,018. These numbers are the same as on the NRV worksheet. The number of head equals 266.

Using the information from the worksheet, Thornton prepared a two page balance sheet using the Frontier Credit format. It was printed on November 14, 2003. Debtors signed the second page. The Debtor Spouse provided none of the information used to create the balance sheet. The balance sheet showed the Debtors had total assets of $1.89 million and liabilities of $637,000, for a net worth of over $1.2 million. The Debtor's equity ownership of Cash Grain was reported to be worth $159,400, and he also had preferred stock in the company valued at $10,000. The list of current assets included $135,018 under the category "Purchases Held for Resale." This is the value assigned to 266 head of cattle.

One of the issues in this case is the source and accuracy of the 266 head of cattle used to compute the $135,018 value of "Purchases Held for Resale" stated in the balance sheet. The Court cannot clearly determine the source of the 266 head number from the evidence presented. Thornton testified that Debtor would have told him the number of cattle he owned. Debtor did not dispute this fact, but he also did not testify as to the number he reported to Thornton. The 266 head may have come from Debtor. It also appears Thornton may have arrived at that figure by adding the number of cattle (235) he

---

[3] The NRV worksheet identified these as 183 stocker steers.

hand-wrote on the July 2003 balance sheet to the 15 cow-calf pairs and one bull already reported on it. Thornton inspected the cattle only to satisfy himself that the number he had been given was realistic, not to do an actual count of them. He said he had been around cattle enough that he could tell the difference if 200 head were in a pasture rather than 100. Assuming that 266 is the number of cattle that were in pasture, that those cattle had the value computed by Thornton, and that Debtor owned only an 80% interest, the value of the balance sheet should have been $108,014. The Debtor did not tell Thornton that he and Craig were at the time of the inspection pasturing cattle together, but the Debtor testified he thought Thornton would have known that as a result of his prior loans and on-going relationship with Frontier.

By letter dated November 18, 2003, Thornton informed Debtors of the approval of the application for a revolving $150,000 line of credit "on a secured basis with a variable rate of 5.50 %, drafting privileges and maturity date of December 1, 2004." Debtors were required to carry livestock insurance and a 20% margin on the loan. The collateral was identified as "accounts, inventory, proceeds, livestock and equipment & accessions" as defined in the Security Agreement. The letter requests Debtors to execute enclosed documents, which presumably were the Note and Loan Agreement and the Security Agreement prepared by Thornton.

So far as Thornton could remember, after he prepared these documents using information the Debtor provided, he took them to the Debtor at his place of business, and had him sign them. Thornton did not remember specifically how this signing went, but

8

said his practice was to "flip through" the loan papers with a borrower like the Debtor, giving him the opportunity to review them. The Debtor then took some documents home for Debtor Spouse to sign, and returned them to Thornton. No one testified whether Debtor Spouse read any of the documents or anyone went over them with her before she signed them. Thornton must have forgotten to give the Debtor the loan application and balance sheet to sign, because a letter in Frontier's file shows those documents were mailed to the Debtors on November 24, 2003, to get their signatures. This explains why the loan application is dated November 14, 2003, but both the Debtors wrote "12-2-03" on the date line following their signatures. The Debtors did not hand-date the balance sheet when they signed it, but typed text on it states it was printed on November 25. Since the letter says the balance sheet was mailed to the Debtors along with the loan application, the Court concludes they signed it the same day they signed the loan application. Frontier first paid out money on the line of credit on November 26, 2003, before the Debtors signed either of these documents.

Frontier gave Debtors drafts they could use like checks to make draws against the line of credit. Since Thornton thought of the line as a cattle loan, he indicated Frontier expected the Debtors to use the line of credit to buy, feed, and otherwise maintain the cattle. Labor charges could be paid with it if they were for "working" the cattle. Debtor's view of the intended purpose was larger, to include anything having to do with his farming operation, including purchase of equipment. In the past, Thornton had advised debtor to use a credit line rather than to apply for a new loan for purchases.

9

The three-page Security Agreement gave Frontier a lien on the Debtors' livestock and on five specific pieces of equipment. Other categories of collateral were listed as well, but Thornton indicated he understood only cattle and the equipment secured the line of credit, and the Debtor testified that was his understanding as well. The second page of the agreement is labeled "Standard Provisions," and the first paragraph on that page included as one of eight numbered circumstances of default: "(5) if Borrower uses disbursements for a purpose other than the stated purpose." No specific purpose for disbursements is stated on the Security Agreement. The Note-and-Loan Agreement showed the loan was for a $150,000 revolving line of credit, with an expiration date of December 1, 2004. Similar to the Security Agreement, the five-page Note-and-Loan Agreement contained a "Standard Provisions" part on its second page that specified eight things the borrowers were supposed to do, including "(4) utilize loan proceeds for the stated purpose." Further down on that page, a paragraph listed seven circumstances of default, including "(5) Borrower fails to use loan proceeds for the stated purpose." Again, nothing in this document specified what the "stated purpose" was.

In addition to the "Standard Provisions" part of the Note-and-Loan Agreement, a "Special Conditions" box was checked and a clause was added saying "Borrowers must maintain a 20% margin on the stocker cattle loan." When asked at trial, the Debtor said he thought this condition meant he was supposed to maintain a 20% profit margin on his cattle. Thornton explained it meant the value of the Debtor's cattle was supposed to remain 20% higher than the outstanding balance owed on the line of credit.

10

### 4. The Debtors' use of the line of credit.

According to a note Thornton placed in Frontier's records in 2005, the first use of the line of credit occurred on November 26, 2003, when Frontier advanced $104,599.25 to pay off a prior lien on the Debtors' cattle. From then through the end of February 2004, Debtors wrote four more drafts to JM Ranch, and one to Cash Grain for feed. Since Thornton testified he thought feeding and caring for the cattle met the loan purposes, nothing presented indicated any of these drafts violated his understanding of the loan documents.

From December 2003, until November 2004, the Debtors wrote about 35 drafts on the line for a total of just over $163,500. For the most part, they made the drafts payable to JM Ranch, and then paid the money to others; however, some of the drafts were made payable directly to others. According to a summary prepared based on the Debtors' testimony at a continued meeting of creditors, that money was spent on the following items:

| | |
|---|---|
| Cattle: | 2,400.00 |
| Feed: | 13,950.00 |
| House: | 23,927.85 |
| Tractor: | 8,000.00 |
| Hay: | 14,572.23 |
| Corn: | 7,537.00 |
| Wheat: | 1,141.55 |
| Bins: | 11,245.00 |
| Cash Grain: | 50,000.00 |
| Fuel: | 1,284.65 |
| Couldn't remember: | 29,450.00 |

11

Together with Frontier's payoff of the prior lien on the cattle, these drafts show the Debtors borrowed a total of about $268,000 on the line of credit during a one-year period. In September 2005, Frontier obtained a default judgment against them for $40,124.03, indicating the Debtors had repaid it at least $228,000 of the money advanced on the line.

Frontier complains that certain of the draws were for purposes other than those stated in the loan application. Debtors wrote a draft for $8,000 on the line of credit in April 2004 and used about $7,300 of that to pay off a lien on a tractor which they later sold for $5,000 and applied the proceeds to a lien on a Ford truck they owned. They sold the tractor in July 2005, and paid the proceeds on the lien the next month. Frontier also complains that in November 2004, with another draft, the Debtors bought wheat seed that they planted, then harvested and sold the next summer, but they applied the proceeds to the lien on the truck in August 2005.

Frontier complains about money from the line of credit that the Debtors deposited into their JM Ranch checking account and then spent on a home they were having built. In May 2004, they paid $13,270 to a bank for construction costs. In June 2004, they paid $6,722.84 to the contractor that was building the home. Debtor did not make these draws; Debtor Spouse wrote the drafts that transferred these amounts to JM Ranch. In July 2004, the Debtors paid $300 for an appraisal on the home. Frontier successfully traced these payments, a total of $20,292.84, to money drawn on the line of credit.

At trial Frontier complained about a net $36,000 draw from the line of credit for JM Ranch that was paid to Cash Grain. The Debtor testified that when he transferred

12

money to Cash Grain, he would have been paying for seed, fertilizer, or chemicals he was buying for his farm operation. He implied he would not have used money from Frontier's line of credit to invest in Cash Grain.

Thornton explained that when the Debtors wrote a draft, the draft number and amount would come to Frontier's accounting department, where it would be applied to the line of credit and paid so long as the balance owed did not exceed the $150,000 limit on the line. Thornton would get a daily report showing the draft number and amount but not the use of the funds. He would have access to copies of the drafts the next day, but would not look at them unless he believed he had a need to.

Thornton did not look at the Debtors' drafts until after they had sold all their cattle and he realized Frontier had insufficient remaining collateral to secure the balance the Debtors owed. Then he looked through the drafts and the monthly statements Frontier had sent to the Debtors in an effort to reconcile the drafts with their use of the proceeds of sales of the cattle. There was no evidence that Thornton, or anyone else on behalf of Frontier, after the loan was approved inspected Debtor's cattle, notified any sale barns of its interest in the cattle, or otherwise monitored the collateral.

### 5. *Sales of cattle by the Debtor and his son, Craig*.

During 2004, cattle were sold in both the Debtor's and Craig's names through Parsons Livestock Market ("Parsons"). On March 31, 2004, the Debtor sold 198 head of cattle there. Parsons issued two checks for the proceeds of that sale, one for $106,174.05

13

payable to the Debtor and his prior cattle lender,[4] and one for $25,000 payable to Craig. The Debtor later paid Frontier $100,000 from the proceeds he had received. He also paid Craig another $5,600 he agreed would have come from the remaining $6,174.05 of the proceeds he had received. Thus the proceeds were split approximately 24% to Craig and 76% to Debtor.

On August 18, 2004, Craig sold eight calves, one bull, 14 cows, and one cow-calf pair, a total of 25 animals, through Parsons. Parsons issued one check for the proceeds of this sale for $15,187.54, payable to Craig. On August 25, 2004, the Debtor sold 8 more stocker cattle through Parsons. The proceeds of $6,199.40 were all paid to Frontier. On December 8, 2004, he sold 45 cows through Parsons. The proceeds of $40,723.60 were all paid to Frontier.

In total, Frontier's evidence showed that the Debtor and Craig sold 275 cattle through Parsons during 2004. The Debtors produced documents showing the Debtor made a few other cattle sales as well that did not go through Parsons. On September 9, 2004, he sold two bulls and two bins and paid the proceeds to Frontier. On December 3, 2004, he sold another bull and paid the proceeds to Frontier. This brings the total documented number of cattle sold to 278.

Although neither the Debtor nor Thornton thought Frontier had a lien on his crops, the Debtor paid Frontier $26,356.56 on October 19, 2004, from the sale of a corn crop.

---

[4] It is not clear why this check was made payable to the prior lender rather than to Frontier, but the Debtor was able to deposit the check and use the proceeds without giving any of them to the prior lender.

14

Frontier also received the $5,736.93 proceeds of another crop received in the form of the buyer's check dated February 14, 2005, that was made out to both Frontier and the Debtor. The amount paid from the proceeds of crops was thus in excess of the total of approximately $31,000 which Craig received from the March 31, 2004 sale of livestock, when the proceeds were split approximately 76% to Debtor, which was paid to Frontier, and 24% to Craig.

**6. *Significant events occurring after the Debtor had sold most of his cattle*.**

In November 2004, all the banks that had been working with the Debtor in his Cash Grain business decided "to freeze everything," putting him out of his main job and under a lot of stress.

In April 2005, the Debtors had their attorney contact Frontier to say they wanted to sell Craig four pieces of equipment that were Frontier's collateral. Sometime earlier, Thornton had reviewed the items and concluded Frontier could get a net recovery of $8,600 if it had to foreclose on them. Negotiations followed, and Frontier agreed to release its lien on the items in return for $10,000, the price Craig was allegedly paying for them. The money was paid to Frontier, and it released its lien on the four items. During an examination conducted pursuant to Federal Rule of Bankruptcy Procedure 2004, Craig allegedly testified he paid the $10,000 for just one of the items, a tractor. Frontier was unable to subpoena Craig to testify at trial, and the Court ruled that despite his absence, his prior testimony was not a type that was admissible. Frontier did present a depreciation schedule contained in Craig's accountant's records that showed Craig

15

acquired a tractor in 2005 at a cost of $10,000, the year of the purchase from the Debtors and Frontier, but did not show his acquisition of the other three pieces of equipment. The accountant said he would assume the cost should have been apportioned among all the components Craig was purchasing if he had bought more than just the tractor with the $10,000, and agreed the different components might have had different depreciation lives.

In July 2005, Frontier sued the Debtors for the remaining balance due on the line of credit. The Debtors did not oppose Frontier's complaint, and judgment was entered on September 9, 2005, for $40,124.03, plus interest. The judgment also declared Frontier had a first and prior lien on the Debtors' farm products, accounts, inventory, and a specified bush hog.

The Debtors filed their Chapter 7 bankruptcy petition on October 5, 2005. According to their schedules, the Debtor had been working in insurance sales for six months by then, as well as continuing to work as a farmer-stockman. He also drew some unemployment compensation during 2004 and 2005. Nothing in the evidence suggested Debtors owned any cattle during 2005.

### 7. The Debtor's credibility.

The Debtor testified, but Debtor Spouse did not. The Court generally found the Debtor's testimony to be credible. He appeared to answer the questions posed by Frontier's attorney truthfully to the extent he could still remember events that mostly occurred three to four years before the trial. He usually conceded transactions recorded in various different places were related when they involved similar amounts of money and

16

dates that were close together, even though he usually seemed not to have an actual memory of the transactions occurring and the records were typically insufficient by themselves to establish the relationships between the transactions.

**ANALYSIS AND CONCLUSIONS OF LAW.**

In this proceeding, Frontier's remaining claims are one against the Debtor to except his debt from discharge under §§ 523(a)(2)(A), (a)(2)(B), or (a)(6), and one against both Debtors to have constructive trusts imposed against their homestead, their Ford pickup truck, and three pieces of equipment they transferred to Craig.

**1. *Exception from discharge for fraud under § 523(a)(2)(A).***

Section 523(a)(2)(A) of the Bankruptcy Code excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by — (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's . . . financial condition."  In order to succeed under § 523(a)(2)(A), Frontier had the burden to establish the following elements by a preponderance of the evidence:

> 1) the debtor knowingly committed actual fraud or false pretenses, or made a false representation or willful misrepresentation; 2) the debtor had the intent to deceive the creditor; and 3) the creditor relied on the debtor's representation. *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir.1996).  The creditor's reliance must have been justifiable, *Field v. Mans*, 516 U.S. 59, 74-75 (1995), and the creditor must have been damaged as a result, *Young*, 91 F.3d at 1373.[5]

---

[5] *State of Missouri ex rel. Nixon v. Audley (In re Audley)*, 275 B.R. 383, 388 (10th Cir. BAP 2002).

Frontier suggests the Debtor defrauded it by: (1) falsely promising to use the line of credit strictly to fund his cattle operation; and (2) either falsely claiming he and his son operated a commingled cattle operation in order to justify giving his son some of the proceeds from his cattle sales, or failing to disclose that his son owned some of the cattle that were in the herd on the Debtor's land. The evidence fails to convince the Court that the Debtor did anything fraudulent, made any deliberate misrepresentation, or otherwise acted by trickery or deceit, or that he took any action intending to deceive Frontier.[6]

**a. Frontier's claim is not excepted from discharge under § 523(a)(2)(A) because of false representations regarding use of the loan proceeds made when the loan was originated.**

Frontier asserts the Debtor falsely promised to use the line of credit solely to fund his cattle operations. The Court finds that Debtor's representations regarding use of the loan proceeds made at the time to loan was originated are not a basis to deny discharge. First, the Court notes it is unclear exactly what Frontier contends the Debtor promised to do with the line of credit. The Commercial Loan Application states the purposes of the line were to refinance a prior lien on the Debtors' cattle, buy stock in Frontier, and to purchase more cattle. But Thornton conceded the Debtor could also properly use the line to pay to feed, care for, and "work" the cattle. Debtor testified that he understood the loan purpose more broadly, that it was intended to fund his cattle and farming operation.

---

[6] *See* 4 *Collier on Bankruptcy*, ¶ 523.08[1][e] at 523-45 (Resnick & Sommer, eds.-in-chief, 15th ed. rev. 2008) ("Actual fraud . . . consists of any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another — something said, done or omitted with the design of perpetrating what is known to be a cheat or deception").

Second, the loan documentation signed by Debtor does not expressly limit the use of loan proceeds. The only possible representation is in the Commercial Loan Application which states the purpose of the loan; there is no express limitation in the Note-and-Loan Agreement or the Security Agreement. The draw "checks" included no requirement as to how the proceeds would be used. Third, to the extent that the Loan Application, which Debtors signed, and Debtor's conversations with Thornton constituted a representation that Debtors would use of the line of credit only for cattle and farming operations, there is absolutely no evidence that this representation was false when made in the fall of 2003 or that Debtor at that time had any intent to deceive Frontier regarding the use of the proceeds.

Although Frontier does not expressly contend that the Court should apply the standards for nondischargeability under § 523(a)2)(A) to each draw as a separate transaction, this approach appears correct since each draw constitutes a separate extension of credit and receipt of money. However, under this analysis, which considers the representations made when each draw was received, Frontier has failed to sustain its burden of proof. Frontier complains about three categories of draws: funds used to pay the lien on a tractor, which was later sold; funds used to pay bills for construction of Debtors' home; and a net $36,000 in draws for JM Ranch which was paid to Cash Grain.

The tracing of loan draws to payments on liens on a tractor, and later a truck, are stated in the findings of fact and will not be repeated here. Tracing of loan proceeds does not satisfy a creditor's burden of proof to except a claim from discharge. As to these

19

transactions, the Court finds lack of evidence that Debtor made a willful misrepresentation and had intent to deceive. Debtor testified that he understood the loan to be for purposes associated with his ranching and farming operation, including purchases of equipment. There is no evidence that the tractor was not used for these purposes, so Debtor could not have made a misrepresentation when making draws for the purpose of paying off the lien on the tractor. Likewise, there is no evidence that Debtor intended to deceive Frontier when paying off the lien on the tractor, then selling the tractor (which was not listed in the items of collateral pledged to Frontier), and using the proceeds to pay off the lien on a truck, which may have also been used for farming and ranching. The additional suggestion that discharge should be denied because funds were drawn from the line of credit for seed and the proceeds of the crops applied to the payment of the lien on the truck is totally without merit. Again there is not basis to find a misrepresentation of intent to deceive. Use of funds for seed was within the loan purposes as understood by Debtor. Frontier had no security interest lien in crops.

As to the funds invested in the Debtor's home, a purpose which in Debtor's view was not contemplated when the loan was originated, the evidence is that these draws were made by Debtor Spouse, not by Debtor. There was no evidence that Debtor was involved in these draws and therefore no basis to find Debtor made a misrepresentation or had intent to deceive Frontier.

Finally, the evidence concerning the $36,000 net draws deposited to JM Ranch was sketchy, and the Court finds no misrepresentation and no intent to deceive. Debtor's

20

farming and ranching was conducted through JM Ranch. Frontier's speculation, not supported by any evidence, that the funds were transferred by JM Ranch to Cash Grain, was refuted by Debtor.

**b. Frontier's claim is not excepted from discharge because of a false representation that Debtor conducted a cattle operation with his son or because of failure to disclose that a portion of the cattle in Debtor's herd was owned by his son.**

The Court does not accept Frontier's contention that Debtor made a misrepresentation that he and Craig commingled their cattle. As stated in the findings of fact, the Court concludes, based upon the record as a whole, that Debtor and Craig for several years prior to the events in issue had an informal arrangement to commingle their cattle operations. Hence, Debtor made no misrepresentation when proceeds of cattle sales were distributed in part to Craig based upon the existence of such an arrangement.

This leaves Frontier's alternative argument that the Debtor defrauded Frontier by failing to disclose that his son owned some of the cattle he offered as collateral for the line of credit he obtained from Frontier in November 2003. The Court denies this position for two reasons. First, this contention relates to the accuracy of the Balance Sheet prepared by Frontier which included the value of cattle as owned by Debtor. Section 523(a)(2)(A) expressly excludes "a statement respecting a debtor's or insider's financial condition" from the misrepresentations that can be the basis for denial of discharge under the subsection. Denial of discharge based upon a materially false financial statement is addressed by § 523(a)(2)(B) and is discussed below.

21

Second, the record contains no evidence from which the Court could conclude that Debtor intended to deceive Frontier when he failed to disclose Craig's interest in the herd during the loan application process. Debtor testified he assumed, because of his long relationship with Thornton, that Frontier was aware that of the commingling of cattle. There is no reason to question the veracity of this statement. In addition, there is no evidence from which the Court can infer intent to deceive. The record reflects that Frontier, for good reason, trusted Debtor and was not aggressive when inquiring about the cattle operation. Under such circumstances, Debtor cannot be denied a discharge.

Frontier failed to satisfy its burden to prove the Debtor obtained the line of credit or made draws on the line of credit through false pretenses, a false representation, or actual fraud. Consequently, the Debtor's obligation to Frontier is not excepted from discharge by § 523(a)(2)(A).

## 2. *False financial statement under § 523(a)(2)(B).*

Frontier has not clearly argued that its claim against the Debtor should be excepted from discharge by § 523(a)(2)(B). However, it has quoted the provision in its trial brief and contends misrepresentation when the balance sheet prepared by Thornton dated November 15, 2003, included the value of 266 head, even though Craig had an interest in the same asset. The Court will therefore address denial of discharge under this subsection.

As relevant here, § 523(a)(2)(B) excepts from discharge a debt:

> (2)　　for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by —
>
> 　　　　　　　　　　***
>
> 　　(B)　　use of a statement in writing —
> 　　　　　　(i) that is materially false;
> 　　　　　　(ii) respecting the debtor's or an insider's financial condition;
> 　　　　　　(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
> 　　　　　　(iv) that the debtor caused to be made or published with intent to deceive.

To succeed on its claim under this provision, Frontier must prove each element under

§ 523(a)(2)(B) by a preponderance of the evidence.[7]  The Court finds the balance sheet

prepared in connection with the line of credit was the only document presented that gave

a picture of the Debtor's overall financial health and could therefore qualify as the written

statement respecting the Debtor's or an insider's financial condition that is required for a

debt to be excepted from discharge under this provision.[8]

　　　　Frontier has not explicitly directed the Court to any representation in the balance

sheet that it contends was false.  Much of its evidence, however, seemed to be aimed at

showing the Debtor did not personally own 266 cattle in October 2003 when he told

Thornton he did, but instead owned some lesser amount because he and Craig had a

---

[7]*See Grogan v. Garner*, 498 U.S. 279, 286-87 (1991); *see also* 4 *Collier on Bankruptcy* ¶ 523.04 at 523-23 to -24 .

[8]See Cadwell v. Joelson (In re Joelson), 427 F.3d 700, 704-14 (10th Cir. 2005) (§ 523(a)(2)(B) applies only to statements that give picture of debtor's overall financial health).

23

commingled herd.[9]

Turning to the elements required for the exception to discharge, the Court finds that Frontier has not satisfied its burden of proof. First, the Court finds that the inclusion of the value of $135,018 for the cattle instead of 75 % or 80% of that value was not materially false with respect to Debtors' creditworthiness. Debtors' net worth reported on the statement was $1,256,423; a reduction of $33,750 or $27,000 would not have been significant. Had Frontier taken into account Craig's ownership it could have requested a security interest in Craig's interest in the cattle or taken a security interest in other assets of Debtors, such a growing crops, marketable securities (valued at $253,759), or additional machinery/equipment.

More importantly, even if the statement of the value of the livestock was materially false, the Court finds that discharge cannot be denied because there is no evidence that "debtor caused [the statement] to be made or published with intent to deceive." The balance sheet, although signed by Debtor and Debtor Spouse, was prepared by Thornton, based in part upon a balance sheet as of July, 2003, prepared by someone other than the Debtor, and information supplied by Debtor to Thornton. At the time it was prepared, Thornton and Debtor had a good working relationship. Debtor was forthright in his testimony at trial, and there is no evidence that he was other than

---

[9] Frontier suggested as an alternative to a commingling of Debtor's and Craig's cattle, the circumstance that Debtor owned 100% of the cattle, because the $47,000 borrowed by Craig and used to fund a portion of the cost of the cattle purchased in the fall of 2003, was a loan from Craig to Debtor. If this were true, the balance sheet would be inaccurate because it omitted Debtor's obligation to Craig.

24

forthright when dealing with Thornton.  Debtor testified that based upon his long

relationship with Thornton, he assumed that Thornton knew that Debtor and his son

operated a joint cattle operation.

The evidence did not convince the Court that Debtor was even aware of the

number of head of cattle used by Frontier when calculating the value of the herd or had

any reason to believe that the value ascribed to his interest in cattle was not correct.  The

number of head is not on the balance sheet signed by Debtor.  The total number of cattle

(266) is not even stated on the worksheet used to prepare the balance sheet, although the

number of cattle in each category is stated.  However, Debtor did not sign the worksheet,

and there is no evidence that he reviewed it.  Even as to those documents that were

signed, the evidence suggests that Debtor's review was cursory.

The Court rejects Frontier's contention that Debtor's discharge should be denied

under § 523(a)(2)(B).  Frontier has not carried its burden of proof.  The Court questions

whether the error in the value of Debtor's interest in livestock was materially false.  More

importantly, even assuming it was, Frontier has not sustained its burden of proof because

there is not evidence that Debtor intended to deceive Frontier when he approved the

statement prepared by Thornton.

### 3. *Willful and malicious injury under § 523(a)(6).*

Section 523(a)(6) of the Bankruptcy Code excepts from discharge any debt "for

willful and malicious injury by the debtor to another entity or to the property of another

entity." In *Kawaauhau v. Geiger*, the Supreme Court ruled that this provision applies

only to a deliberate or intentional injury, not merely a deliberate or intentional act that

leads to injury,[10] explaining that this means the debtor must have intended the

consequences of the act he or she performed, not simply the act itself.[11] Frontier does not

provide the Court with any specific acts which it contends constitute willful and

malicious injuries within the meaning of § 523(a)(6). This exception to discharge is

applicable to willful and malicious conversions of collateral,[12] so the Court will assume

that this is Frontier's contention.

When Debtor paid Craig a portion of the proceeds from the sale of cattle, there is

no evidence that he did not do so as a deliberate act to injure Frontier. Craig was paid

because of his interest in the commingled cattle. Acts done without malice and intent to

injure are not sufficient to except a debt from discharge, even though they result in less

than full repayment of a loan. Rather than intending to harm Frontier by diverting

collateral, the Court finds that Debtor intended to satisfy his obligation to Frontier.

Debtor made substantial payments to Frontier from sales of crops, assets neither he nor

Thornton thought were covered by Frontier's security interest. Debtor, through his

attorney, also arranged for sale of collateral so the proceeds could be applied to the loan

---

[10] 523 U.S. 57, 60-64 (1998).

[11] *Id*. at 61-62.

[12] *4 Collier on Bankruptcy* ¶ 523.12[3].

26

balance.

Frontier has failed to satisfy its burden to prove the Debtor intentionally injured it or its property, so the Debtor's obligation to Frontier is not excepted from his discharge by § 523(a)(6).

**4. *The grounds for constructive trust are not present*.**

Frontier asks the Court to impose a constructive trust on the Debtors' homestead and on their Ford truck, and to impose a constructive trust on three pieces of equipment the Debtors allegedly transferred to Craig as gifts. The Kansas Supreme Court has adopted a lower court's explanation that either actual or constructive fraud must be shown for the constructive trust remedy to be available:

> "A constructive trust arises wherever the circumstances under which property was acquired make it inequitable that it should be retained by the person who holds the legal title." *Logan v. Logan*, 23 Kan. App. 2d 920, syl. ¶ 6, *rev. denied* 262 Kan. 961 (1997). To prove a constructive trust, there must be a showing of one of the two types of fraud: actual or constructive. 23 Kan. App. 2d 920, syl. ¶ 7.

> Actual fraud is not at issue in this case. "Constructive fraud is a breach of a legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others or violate a confidence, and neither actual dishonesty or purpose or intent to deceive is necessary." 23 Kan. App. 2d 920, syl. ¶ 7. Two additional elements also must be proved: "[T]here must be a confidential relationship [, and] the confidence reposed must be betrayed or a duty imposed by the relationship must be breached." 23 Kan. App. 2d 920, Syl. ¶ 8.[13]

The Court concluded at the end of the trial that Frontier failed to show the Debtor Spouse committed any fraud, and has now concluded in this opinion that Frontier failed to establish that the Debtor committed any fraud in connection with the line of credit, so

---

[13] *Garrett v. Read*, 278 Kan. 662, 673-74 (2004).

27

the actual fraud ground for imposing a constructive trust against any of the Debtors'

assets arising from draws on the line of credit does not exist.  The Court further concludes

Frontier has failed to establish that the Debtors gave Craig three of the four pieces of

equipment involved in the deal their attorney arranged with Frontier for no consideration

and sold him the tractor alone for the $10,000 he paid to Frontier.  The depreciation

schedule Craig's accountant had in his files is simply not enough to convince the Court

the Debtors intended to defraud Frontier in this transaction.  Frontier's own estimate of

the value of the four pieces of equipment was less than the amount it received.

Since the Court has found the Debtors committed no actual fraud, this leaves only

the constructive fraud ground for imposing a constructive trust on any of their property,

which requires a breach of a confidential relationship.  The Kansas Court of Appeals

> has defined a confidential relationship " ' "as any relationship of blood, business,
> friendship, or association in which one of the parties reposes special trust and confidence
> in the other who is in a position to have and exercise influence over the first party." '
> [Citation omitted.]"  *Heck v. Archer*, 23 Kan. App. 2d 57, 63, 927 P.2d 495 (1996).  The
> mere relationship between a parent and a child does not raise a presumption of a
> confidential and fiduciary relationship.  *Curtis v. Freden*, 224 Kan. 646, 651, 585 P.2d
> 993 (1978).[14]

So the type of relationship necessary to support a finding of constructive fraud is one

which would have enabled the Debtors to exercise improper influence over Frontier.  This

clearly excludes an ordinary lender-borrower relationship like Frontier had with the

Debtors.   Since the Debtors committed no actual fraud and did not have any confidential

---

[14] *Nelson v. Nelson*, 38 Kan. App. 2d 64, 78 (2007).

relationship with Frontier, Frontier's claim to have a constructive trust imposed on the Debtors' homestead, their Ford truck, or the three items they transferred to Craig must fail.

**CONCLUSION.**

For these reasons, the Court concludes: (1) Frontier has failed to prove that its claim against the Debtor should be excepted from his discharge by §§ 523(a)(2)(A), (a)(2)(B), or (a)(6). Frontier's evidence was largely a story of a line of credit that at the end of the day was not adequately secured where the creditor could trace some draws to purposes for which the loan was not intended. The story failed to include intentional misrepresentations, fraud, deceit, malice, and intent to harm, the circumstances which are necessary to deny a Debtor the right of discharge. Excepting a debt from discharge can significantly affect a debtor's fresh start, and accordingly the exceptions on which Frontier relied are strictly construed in favor of the debtor and strictly construed against the creditor, who has he burden of proof. In this case, Frontier simply did not satisfy its burden of proof under §§ 523(a)(2)(A), (a)(2)(B), or (a)(6). Frontier has also failed to prove that a constructive trust should be imposed against the Debtors' homestead, their Ford truck, or any of the four pieces of equipment they transferred to Craig.

This Opinion will not become a final judgment on Frontier's claims against the Debtors until Frontier's claims against defendant Craig Norris are resolved.

**IT IS SO ORDERED.**

# # #

29